IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| TERESA L. MEDINA, | ) CIVIL NO. 12-00364 JMS-KSC |
| | ) |
| Plaintiff, | ) ORDER GRANTING IN PART |
| | ) DEFENDANT FCH ENTERPRISES, |
| vs. | ) INC., DBA ZIPPY'S |
| | ) RESTAURANTS' MOTION FOR |
| FCH ENTERPRISES, INC., DBA | ) SUMMARY JUDGMENT, AND |
| ZIPPY'S RESTAURANTS; AND | ) REMANDING REMAINING ACTION |
| DOE DEFENDANTS 1-100, | ) TO THE FIRST CIRCUIT COURT OF |
| | ) THE STATE OF HAWAII |
| Defendants. | ) |
| _____ | ) |

**ORDER GRANTING IN PART DEFENDANT FCH ENTERPRISES, INC., DBA ZIPPY'S RESTAURANTS' MOTION FOR SUMMARY JUDGMENT, AND REMANDING REMAINING ACTION TO THE FIRST CIRCUIT COURT OF THE STATE OF HAWAII**

## I. INTRODUCTION

In this action alleging unlawful discrimination in employment,

Defendant FCH Enterprises, Inc., dba Zippy's Restaurants ("Defendant" or

"Zippy's") moves for summary judgment on all claims asserted against it by

Plaintiff Teresa Medina ("Plaintiff" or "Medina").  Based on the following, the

court GRANTS Defendant's Motion as to all of Plaintiff's federal claims, and

REMANDS the remaining state-law claim under the Hawaii Whistleblower

Protection Act ("HWPA"), Hawaii Revised Statutes ("HRS") § 378-62, to the First

Circuit Court of the State of Hawaii.[1]

## II. BACKGROUND

**A.    Factual Background**

For purposes of this summary judgment motion, the court views the evidence in the light most favorable to Plaintiff.  *See, e.g.*, *Sullivan v. Oracle Corp.*, 662 F.3d 1265, 1270 (9th Cir. 2011).  Viewed as such, the evidence indicates as follows.

### 1.    *Medina Is Hired by Zippy's*

Zippy's hired Medina for its wait staff in June 2007.  Doc. No. 30-1, Pl.'s Decl. ¶ 2; Doc. No. 25-2, Rand Decl. Ex. A.  Medina is female, and was born in 1961.  Doc. No. 30, Def.'s Concise Statement of Facts ("CSF") ¶ 27.[2]  When she was hired, she completed an application that expressly preserved her status as an "at-will" employee.  *Id.* ¶ 1.

Medina had previously worked at an IHOP restaurant, but left due to difficulties with her then-supervisor Mike Nakila ("Nakila").  *Id.* ¶ 2.  After she began working at Zippy's, Medina saw Nakila at the restaurant and encouraged

---

[1]  Plaintiff does not object to dismissal of her claims for Intentional Infliction of Emotional Distress (Count Four), Breach of Contract (Count Five), and Promissory Estoppel (Count Six).  Thus, the Motion is also GRANTED as to those counts.

[2]  Where Plaintiff does not dispute a particular fact, the court cites directly to Defendant's CSF.

him to apply to work at Zippy's.  *Id.*; Doc. No. 25-14, Rand Decl. Ex. M at 57.[3]

Nakila was subsequently hired by Zippy's as wait staff, but initially had little

contact with Medina.  Doc. No. 30, Def.'s CSF ¶ 3.  Nakila later began to work

weekends with Medina.  *Id.*

       Nakila made two comments to Medina regarding her age.  Both

comments occurred prior to February 9, 2010.  The first was "too bad there wasn't

a pill for being old," and the second was "Oh you know when you get old, certain

things happen to you."  *Id.* ¶ 4.  The first comment was probably made in late

December 2009.  Doc. No. 25-14, Rand Decl. Ex. M at 109.  Medina told her

managers about the comments, and that she "didn't appreciate how he talked to

me."  *Id.* at 97.  She indicates that managers "Caesar" and "Ronald" told her they

would talk to Nakila.  Ronald also told her "[Nakila] was probably joking."  *Id.* at

98.[4]

---

[3]  The citations to Exhibit M, which is Medina's deposition, are to the deposition transcript page numbers.

[4]  In her declaration, Medina also states that she "noticed that [Nakila] was constantly harassing the other wait staff, especially Diane and Sharon" and that "Sharon complained to Caesar and Ronald that [Nakila] was teasing her about her age and appearance, and Sharon requested that [Nakila] be informed that he was not to speak to her anymore."  Doc. No. 30-1, Pl.'s Decl. ¶ 46.  This occurred before Nakila's comments to Medina, *id.* ¶ 48, that is, well before February 2010.

Earlier,[5] a different Zippy's employee ("Rudy") commented to Medina

that "she was old, fat, and jiggly."  Doc. No. 30, Def.'s CSF ¶ 5.  Medina's

husband went to the restaurant that night and spoke to the manager about that

comment, and Medina had "no other issues" working with Rudy after that incident.

*Id.*  Besides these instances with Rudy and Nakila, no other Zippy's employees

made comments to Medina regarding her age.  Doc. No. 25-14, Rand Decl. Ex. M

at 117.

### 2.    *Altercations with Nakila in January 2010*

On January 23, 2010, Medina and Nakila were involved in a

workplace incident involving the seating of customers and assignment of tables.

Medina testified that Nakila was "giving everybody else [besides Medina and

another wait person, Diane] tables."  *Id.* at 121.  Medina reported this to the

manager, Ronald.  Ronald apparently then asked Nakila why he was not assigning

tables to Medina and Diane, and Nakila denied such behavior.  *Id.*  Medina testified

that Nakila, apparently angry at her, "[came] flying around the corner, yelling at me

. . . like he wants to hurt me."  *Id.* at 122.  According to Medina, Nakila was

aggressive:  "his eyes was so big, like it was bulging out of his . . . head," *id.*, and

---

[5]  Although Medina could not recall exactly when Rudy made the remarks, she knows
that it was before the incidents with Nakila (*i.e.*, before February 2010).  *See* Doc. No. 25-14,
Rand Decl. Ex. M at 271.

he was yelling and swearing at her.  *Id*. at 129.  Medina accused Nakila of being on

drugs (telling him "are you flying?"), and she told Ronald that Zippy's should

"drug test" Nakila.  *Id.* at 130.  Other employees apparently had to then restrain

Nakila from physically confronting Medina.  *See id.* ("People was holding him

back").

On January 31, 2010, Medina and Nakila were again involved in a

similar altercation.  Nakila was yelling for others to "get away from my food,"

apparently telling other employees not to deliver food for his assigned tables.  *Id.* at

137.  Medina told another employee, "If [Nakila] complained that I'm not

delivering food, you heard for yourself that he don't want me to touch his food."

*Id.*  Overhearing this, Nakila confronted Medina, "yelling and coming towards

[her]," screaming "[y]ou talking about me?"  *Id*.  Another employee interceded,

and blocked Nakila from Medina, who was afraid Nakila was going to hit her.  *Id*.

Medina told the manager, Caesar, that she "wanted him to call [human resources]

. . . because I'm tired of them blaming me for stuff that I didn't do."  *Id*. at 138-39.

### 3.    *Meetings with Management in February 2010*

On February 2, 2010, Medina met with (or was simply presented a

form from) Ronald regarding the January 23, 2010 incident.  Doc. No. 25-17, Goya

Decl. Ex. A.  Although Medina disputes the events as described on that form, the

form states, in part:

> On Saturday 1/23/2010 [Medina] got into [an] argument
> with [Nakila] over the [seating] chart.  [Medina] was
> accusing [Nakila] of sitting customers without following
> the [seating] chart.  Also [Medina] accused [Nakila] of
> doing drugs.  They both exchanged words with each other
> causing a hostile work environment!

*Id.*  Regarding "corrective action," the form states:

> Need to be able to resolve conflicts in a professional
> manner!  Need to be able to control emotions and not get
> into shouting [matches].  Need to bring up things in a
> [responsible] manner.

*Id.*  And as to "disciplinary action to be taken if correction is not made in time

frame," the form states "next incident will result in suspension" (in printed text),

followed by "up to termination depending on severity" (in handwritten text).  The

form was signed by Medina, an assistant manager, and the restaurant manager on

February 2, 2010.  It was also signed by Zippy's' Employee Relations Manager

May Goya ("Goya") on February 10, 2010.  *Id.*  Nakila signed a form with the

same warnings.  Doc. No. 33-4, Goya Decl. Ex. A.

On February 6, 2010, Goya met with Medina and Nakila regarding

one or both incidents.  Doc. No. 25-16, Goya Decl. ¶ 2.[6]  The meeting apparently

---

[6] Medina's declaration indicates a meeting between Nakila and Goya on February 7, 2010.  Doc. No. 30-1, Pl.'s Decl. ¶ 89.  This discrepancy in the date is not material.

6

did no go well between Medina and Nakila, as Medina declares in part that Nakila "started screaming at me[.]"  Doc. No. 30-1, Pl.'s Decl. ¶ 90.  Goya attests that she "made it clear to Medina that any further unprofessional behavior would not be condoned and future incidents of confrontations or arguments with other employees would result in her termination."  Doc. No. 25-16, Goya Decl. ¶ 2.  For her part, Medina states that Goya told them "[i]t is obvious that this isn't going to work.  Mr. Nakila you go back to work and Teresa you go home and cool off."  *Id.*  Medina indicates that she informed Goya at this meeting that she "was going to get a temporary restraining order ('TRO') against [Nakila] since it was obvious that Zippy's was not going to protect me while in the workplace."  Doc. No. 30-1, Pl.'s Decl. ¶ 91.  And, indeed, on February 8, 2010, Medina obtained an Ex Parte TRO against Nakila from the District Court of the First Circuit, State of Hawaii, preventing Nakila from contacting Medina for a period of ninety days.  Doc. No. 25-6, Rand Decl. Ex. E.  The TRO was served on Nakila on February 9, 2010, at another meeting between Medina, Nakila, Goya, and another Zippy's representative.  Doc. No. 30-1, Pl.'s Decl. ¶ 96.

At the February 9, 2010 meeting, Medina and Nakila were both warned that "this was their last chance and the next incident will result in immediate termination."  Doc. No. 25-16, Goya Decl. ¶ 2.  Medina confirms that

she "was given a last chance warning" and was told that "if something like this happens again" she would be fired, although she contends that she did not think the warning was also directed at Nakila.  Doc. No. 25-14, Rand Decl. Ex. M at 168-69. After the warning was given, Medina unveiled the TRO and served it on Nakila. *Id.* at 169.  After that, Medina contends that Zippy's "said they was going to set up something for us, and everything was going to be okay and we can work[.]"  *Id.* at 175.  According to Medina, she "didn't work with [Nakila] after the TRO was served," *id.* at 180, although she contends she later lost work time because she had to leave an hour early to avoid interacting with Nakila.  Doc. No. 30-1, Pl.'s Decl. ¶ 97; Doc. No. 25, Def.'s CSF ¶ 15.  Zippy's payroll records, however, show that Medina worked the same number of hours both before and after the TRO was issued.  Doc. No. 25, Def.'s CSF ¶ 16.

### 4.    The October 21, 2010 Incident

On October 21, 2010, Medina was involved in a workplace altercation with another employee, Jeanette Olivera ("Olivera").  For the last two hours of the shift, Medina contends that Olivera "started sitting me three tables at a time."  Doc. No. 25-14, Rand Decl. Ex. M at 219.  Medina told Olivera, "how come you not picking up tables?" *id.* at 220, to which Olivera allegedly responded, "Frick you.  I have tables."  *Id.*  Medina reported these circumstances to the manager, Ronald,

who responded by indicating he would talk to Olivera.  *Id.* at 221.  Medina

contends that the tables were not distributed evenly, and that Olivera then refused

to help her with a difficult customer.  *Id.*; *see also* Doc. No. 30-1, Pl.'s Decl. ¶ 99.

Medina testified that, after she spoke with Ronald, Ronald told her that they were

arguing and fighting, and if they did not stop, "he's gonna write us up."  Doc. No.

25-14, Rand Decl. Ex. M at 227; *see also* Doc. No. 30-1, Pl.'s Decl. ¶ 100.

The restaurant uses a board to roughly indicate the distribution of

tables amongst wait help.  Doc. No. 25-14, Rand Decl. Ex. M at 222.  The

distribution is noted by a simple tally of the number of tables assigned to each

person.  *See, e.g.*, Doc. No. 25-9, Rand Decl. Ex. H.  After reporting the

circumstances to Ronald, Medina contends that she noticed the board incorrectly

reflected the table distribution.  *Id.* at 221 ("She had her lines all the way across

and I was . . . way behind her.  And I was thinking, how can that be 'cause I have

all these customers and she barely had anybody.").  Medina responded by erasing

the board.  *Id.* at 222.

Medina admitted that she erased the board because the board was

wrong and she wanted to "even out" the assignments, but also testified that the

board is normally only erased when the assignments are equal and the board is

filled, at which point "we start all over again."  *Id.* at 229; Doc. No. 25, Def.'s CSF

¶ 20.  Medina stated that, in this instance, she was erasing it "because [she] thought [Olivera] had not put what was correct on the board."  Doc. No. 25-14, Rand Decl. Ex. M at 229.  That is, although (as Medina describes it) "we erase it all day," *id.* at 222, Medina acknowledged that this erasure was different.  *Id.* at 230 (Q:  This was a different situation?  A:  Yes, because she was obviously trying to give me more tables after that. . . .  So I didn't wanna play that game with her.").  Further, Medina explained that she did not tell Ronald she was going to erase the board because it was wrong, but because "he should have went up there when I talked to him and looked [at] it and done something about it."  *Id.* at 229.

And, indeed, after Medina erased the board, Olivera "started going off."  *Id.* at 227.  That is, Olivera "was yelling and there was customers in the restaurant."  *Id.* at 231.  Medina says she walked away, and that "[a]fter [Olivera] yelled at me in the kitchen . . . I just did my side work, finished up my tables, and I left."  *Id.*

### 5.    *Medina's Employment Is Terminated*

On October 28, 2010, Medina received a call from a manager at Zippy's telling her to stay home "because he heard that [she] had a confrontation with [Olivera]."  Doc. No. 30-1, Pl.'s Decl. ¶ 104.  The next day, Medina met with Goya at the restaurant, and was given a chance "to tell [her] side of the story."

Doc. No. 25-14, Rand Decl. Ex. M at 238.  On November 2, 2010, Goya called

Medina, and Medina agreed to a meeting at Goya's office for November 3, 2010.

*Id.* at 240-41.  Medina testified that, after thinking about it, she called Goya back

and asked Goya if she was going to be fired.  *Id.* at 243.  After Goya responded "oh

yes, that's gonna come up," Medina told Goya "I'm not gonna come down there to

sign any papers and waste my gas."  *Id.*  At that point, Zippy's terminated

Medina's employment.  *See* Doc. No. 25-16, Goya Decl. ¶ 4.

Goya attests that she "was aware of Medina's prior confrontations

with Nakila" where she "had specifically told her that it was her last chance and on

the next occasion she would be terminated."  *Id.*  Goya "agreed with the

recommendation of the Store Manager, Troy Kane, that Medina's employment

should be terminated," and that the decision "centered solely on Medina's

performance issues and had nothing to do with age and gender."  *Id.*  She concludes

that "Medina's employment was terminated due to Medina's continued misconduct

in the October 21, 2010 altercation with Olivera."  *Id.*

## B.    Procedural Background

On April 28, 2011, Medina filed an administrative charge of

discrimination with both the Hawaii Civil Rights Commission ("HCRC") and the

Equal Employment Opportunity Commission, asserting that her termination was

11

improperly based on her age, gender, and in retaliation for opposing discrimination. Doc. No. 25-12, Rand Decl. Ex. K.  On September 21, 2011, the HCRC issued a "right to sue" letter, recommending that "the case be closed on the basis of no cause."  *Id.* Ex. L.

On February 12, 2012, Plaintiff filed suit in the Circuit Court of the First Circuit, State of Hawaii.  Doc. No. 1-2.  Her Complaint alleges (1) violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., for gender-based discrimination and retaliation (Count One); (2) violations of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 633a, for age-based discrimination and retaliation (Count Two); (3) violations of the HWPA (Count Three); (4) intentional infliction of emotional distress (Count Four); (5) breach of contract (Count Five); and (6) promissory estoppel (Count Six). Given the federal claims, Zippy's removed the action to federal court on June 26, 2012.  Doc. No. 1.

On March 6, 2013, Zippy's filed its Motion for Summary Judgment. Doc. No. 24.  Plaintiff filed her Opposition on May 7, 2013.  Doc. No. 29.  As noted above, she does not oppose dismissal of her claims for emotional distress, breach of contract, and promissory estoppel.  *Id.* at 3.  Zippy's filed a Reply on

May 14, 2013.  Doc. No. 33.  The Motion was heard on May 29, 2013.[7]

### III.  <u>STANDARD OF REVIEW</u>

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Rule 56(a) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 323); *see also Jespersen v. Harrah's Operating Co.*, 392 F.3d 1076, 1079 (9th Cir. 2004).  "When the moving party has carried its burden under Rule 56[(a)] its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward

_____

[7]  After the hearing, Zippy's filed a Supplement to its Motion.  Doc. No. 36.  Because this Supplement was filed without leave of court, it is stricken and will not be considered by the court.

13

with specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986) (citation and internal quotation signals omitted); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986) (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment).

"An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson*, 477 U.S. at 248). When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see also Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1126 (9th Cir. 2008) (stating that "the evidence of [the nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor." (citations omitted)).

## IV. **DISCUSSION**

Given Plaintiff's concession as to Counts Four, Five, and Six, the remaining claims against Zippy's are (1) violations of Title VII for gender-based discrimination and retaliation; (2) violations of the ADEA for age-based

14

discrimination and retaliation;[8] and (3) violations of the HWPA.  The court first addresses the federal claims in Counts One and Two, and then discusses whether to reach the merits of Count Three.

## A.   Count One:  Title VII Gender Discrimination

Medina asserts a claim under Title VII based on allegations of illegal gender discrimination in employment.  Title VII makes it illegal for an employer to discriminate on the basis of an individual's "race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Zippy's moves for summary judgment, contending that Medina cannot establish a prima facie case of gender discrimination.  It further argues that, even if Medina could make a prima facie case, Zippy's had a legitimate, non-discriminatory reason for her termination and Medina cannot establish that the reason was a pretext for illegal discrimination.

### 1.   Analyzing Title VII Claims at Summary Judgment

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), provides a useful and accepted framework to address Title VII claims, although nothing

---

[8] Plaintiff alleges retaliation, although it is unclear whether her claim is based on retaliation under (1) Title VII's anti-retaliation provision, 42 U.S.C. § 2000e-3(a); (2) the ADEA's anti-retaliation provision, 29 U.S.C. § 623(d); or (3) only under the HWPA.  The court analyzes retaliation under both federal counts, mindful that "the ADEA anti-retaliation provision is 'parallel to the anti-retaliation provision contained in Title VII,' and that 'cases interpreting the latter provision are frequently relied upon in interpreting the former.'"  *Hashimoto v. Dalton*, 118 F.3d 671, 675 n.1 (9th Cir. 1997) (quoting *Passer v. Am. Chem. Soc.*, 935 F.2d 322, 330 (D.C. Cir. 1991)).

requires the parties to invoke it.  *McGinest v. GTE Serv. Corp*., 360 F.3d 1103, 1122 (9th Cir. 2004) (citing *Costa v. Desert Palace*, 299 F.3d 838, 855 (2002) (en banc)).  It is "a tool to assist plaintiffs at the summary judgment stage" in cases where there may be "difficulties [in] proving intent to discriminate in a disparate treatment context."  *Costa*, 299 F.3d at 854.  When responding to a summary judgment motion, the plaintiff "may proceed by using the *McDonnell Douglas* framework, or alternatively, may simply produce direct or circumstantial evidence demonstrating" discriminatory intent.  *Id*.  That is, a plaintiff may respond by producing evidence "demonstrating that a discriminatory reason more likely than not motivated the employer."  *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1105 (9th Cir. 2008) (quoting *Metoyer v. Chassman*, 504 F.3d 919, 931 (9th Cir. 2007)).  Here, the parties present their respective arguments under the traditional *McDonnell Douglas* framework.

Under *McDonnell Douglas*, Plaintiff has the initial burden to establish a prima facie case of discrimination.  *EEOC v. Boeing Co.*, 577 F.3d 1044, 1049 (9th Cir. 2009) (citation and quotation omitted).  A prima facie case under *McDonnell Douglas* requires a plaintiff to offer proof that: (1) she belongs to a protected class; (2) she performed her job adequately or satisfactorily; (3) she suffered an adverse employment action such as termination or demotion; and

(4) other similarly situated employees who do not belong to the same protected class were treated differently.  *McDonnell Douglas*, 411 U.S. at 802; *see Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006); *Noyes v. Kelly Servs.*, 488 F.3d 1163, 1168 (9th Cir. 2007).

"The requisite degree of proof necessary to establish a *prima facie* case for Title VII . . . on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence."  *Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145, 1148 (9th Cir. 1997) (citation omitted).  If Plaintiff puts forth her prima facie claim, the burden then shifts to Defendant to put forward a legitimate, non-discriminatory reason for its actions.  If Defendant proffers such a reason, the burden shifts back to Plaintiff to show that Defendant's reason is actually a pretext for discrimination.  *Boeing Co.*, 577 F.3d at 1049 (citation and quotation omitted).

"[A] plaintiff's burden is much less at the prima facie stage than at the pretext stage."  *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1158 (9th Cir. 2010).  That is, circumstantial evidence of pretext must be specific and substantial, *see Becerril v. Pima Cnty. Assessor's Office*, 587 F.3d 1162, 1163 (9th Cir. 2009), and a plaintiff must do more than merely deny the credibility of the defendant's proffered reason.  *See Schuler v. Chronicle Broad. Co.*, 793 F.2d 1010, 1011 (9th

Cir. 1986).  "A plaintiff can show pretext directly, by showing that discrimination [or retaliation] more likely motivated the employer, or indirectly, by showing that the employer's explanation is unworthy of credence."  *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003); *see also Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1094-95 (9th Cir. 2005).  "Direct evidence typically consists of clearly sexist, racist, or similarly discriminatory [or retaliatory] statements or actions by the employer."  *Coghlan*, 349 F.3d at 1095.  Circumstantial evidence requires an additional inferential step to demonstrate discrimination.  *Id.*

### 2.  *Application of Framework to Gender-based Allegations*

At the first stage -- whether Medina has established a prima facie case -- the parties do not dispute that Medina is a member of a protected class (female) and that she suffered an "adverse employment action" (her termination on November 2, 2010).  Zippy's, however, disputes both the second element (whether Medina was performing her job adequately or satisfactorily) and the fourth element (whether a similarly-situated male employee was treated differently).

#### a.  *From Zippy's perspective, Medina was not "performing her job adequately or satisfactorily"*

As to job performance, Zippy's points to the October 21, 2010 altercation between Olivera and Medina, during which Medina improperly erased the board that noted the assignment of tables.  *See* Doc. No. 25-16, Goya Decl. ¶ 4

("Medina's employment was terminated due to Medina's continued misconduct in the October 21, 2010 altercation with Olivera").  Medina, however, argues that it was normal for her to erase the board because it was done on a regular basis -- the point apparently being that Medina's actions were not improper.  But the uncontested record demonstrates otherwise.

It is undisputed that, after Medina notified the manager (Ronald) of the dispute regarding the distribution of tables, Ronald told Medina "if we don't stop, he's gonna write us up."  Doc. No. 25-14, Rand Decl. Ex. M at 227; *see also id.* at 228 ("Q:  And he said if you don't stop it, he's going to write you both up?  A:  Yes, and he just letting me know.").

It is also undisputed that Medina erased the board during the incident because she thought it listed wrong information and she wanted to "even out" the assignments -- it was not the "usual" situation where a board is erased when the assignments are equal and "we start all over again."  *Id.* at 229; Doc. No. 25, Def.'s CSF ¶ 20.  Medina acknowledged that she "[wasn't] erasing it because [she and Olivera] were even.  [She was] erasing it because [she] thought [Olivera] had not put what was correct on the board."  Doc. No. 25-14, Rand Decl. Ex. M at 229.  And she admitted she did so only *after* being dissatisfied with the manager's actions.  *See id.* ("Q:  Did you say to Ronald, 'you know, I'm gonna erase the board

19

because it's not even'?  A:  No, because he should have went up there when I talked to him and looked [at] it and done something about it.").  Further, Medina's actions appear to have escalated the situation.  She testified that after she erased the board, Olivera "was yelling and there was customers in the restaurant so I walked away. . . .  After she yelled at me in the kitchen?  After that, I just did my side work, finished up my tables, and I left."  *Id.* at 231.

And it is also undisputed that Zippy's had previously warned Medina -- as she admits and as is documented in Zippy's personnel records -- on February 9, 2010 that the "next incident" could or would result in termination.  Doc. No. 25-14, Rand Decl. Ex. M at 168-69; Doc. No. 25-7, Rand Decl. Ex. F at 2; Doc. No. 25-17, Goya Decl. Ex. A.

Thus, the record amply supports Zippy's position that Medina was not performing satisfactorily when she was terminated.  At first glance, erasing the board might not appear serious.  But viewed in context where the behavior was part of an altercation with another employee and involved Medina's dissatisfaction with her manager's actions (or inactions), there is no dispute that Zippy's thought Medina's behavior was improper.  *Cf. Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (2002) ("[C]ourts only require that an employer honestly believed its reasons for its actions, even if its reason is foolish or trivial or even baseless.")

(citation and internal quotation marks omitted).  That is, "it is not clear that [Medina] was performing her job 'well enough to rule out the possibility that she was fired for inadequate job performance.'"  *Id.* at 1062 n.8 (quoting *Pejic v. Hughes Helicopters, Inc.*, 840 F.2d 667, 672 (9th Cir. 1988)).

> ### b.     No other similarly-situated males were treated differently

Zippy's also contends that Medina cannot meet the fourth element of her prima facie case:  that a similarly-situated male was treated differently than her.  In this regard, Medina identifies only Nakila as such an individual.  Doc. No. 29, Pl.'s Opp'n at 14.

But clearly Nakila was not "similarly situated."  True, Nakila and Medina were both disciplined in February 2010, and Nakila was not later terminated (at least as of the date of Medina's termination).[9]  The record, however, contains no evidence indicating that Nakila had any event similar to Medina's October 21, 2010 "board-erasing" incident *after* February 2010.  That is, according to the record, Medina had another incident of unsatisfactory performance but Nakila did not.  *See Hawn*, 615 F.3d at 1157 (reiterating that to be "similarly situated" employees must be similar "in all material respects") (citations omitted).

---

[9]  Medina testified that she "heard [Nakila] got fired for giving free food" although she did not know when that occurred.  Doc. No. 25-14, Rand Decl. Ex. M at 276.

And Medina has not identified any *other* male employee that was not terminated with her same record, and with a similar workplace incident as occurred on October 21, 2010.

      c.    *Zippy's has proffered a legitimate, non-discriminatory reason for termination, and there is no evidence of pretext*

Although Medina has failed to make a prima facie case of gender discrimination, the court nevertheless proceeds with the *McDonnell Douglas* analysis, given that the degree of proof necessary to establish a prima facie case is "minimal." *Cordova*, 124 F.3d at 1148. That is, even if Medina's arguments -- construed in her favor -- could create a prima facie case, Zippy's has identified a legitimate, non-discriminatory reason for Plaintiff's termination: the October 21, 2010 incident with Olivera where Medina erased the board. As discussed above, Zippy's was well within its prerogative to consider Medina's altercation with Olivera (and Medina's erasing the board) to constitute unsatisfactory job performance that followed a prior warning.[10]

In turn, Medina has no evidence that suggests the incident was a pretext for gender discrimination, much less the required "specific and substantial"

_____

[10] The October 21, 2010 incident is analyzed at both the prima facie and pretext stages, although by different standards. *See Hawn*, 615 F.3d at 1158-59 ("Even though a comparison to "similarly situated" individuals may be relevant both to plaintiffs' prima facie case and proof of pretext, these inquiries constitute distinct stages of the *McDonnell Douglas* burden-shifting analysis.").

circumstantial evidence. *See Becerril*, 587 F.3d at 1163. She has absolutely no *direct* evidence that Medina's gender "more likely motivated" Zippy's to terminate her. *See Coghlan*, 349 F.3d at 1095. Nor, for a circumstantial case, does she have evidence that Zippy's' "explanation is unworthy of credence." *Vasquez*, 349 F.3d at 641. Undisputably, Medina and Olivera were involved in a verbal altercation on October 21, 2010 (regardless of any factual dispute as to who was at fault), and Medina admitted that she erased the board because she thought it reflected the wrong information -- after being dissatisfied with the manager's actions. And she acknowledges that she erased the board in a different situation than normal (it was not because the board's tally was equal, but it was because she believed it was wrong and Olivera was using it to distribute the work unevenly). Thus, even if Medina's deposition testimony could create a dispute of fact as to whether information on the board was wrong, there is no dispute that Zippy's legitimately considered the altercation and related events to be inappropriate. *See Villiarimo*, 281 F.3d at 1063 ("In judging whether [defendant's] proffered justifications were 'false,' it is not important whether they were objectively false (e.g., whether [plaintiff] actually lied). Rather, courts only require that an employer honestly believed its reason for its actions, even if its reason is foolish or trivial or even baseless.") (citation and internal quotation marks omitted). There is no evidence

23

that the October 21, 2010 incident was contrived, much less any evidence that

Zippy's "did not honestly believe its proffered reason[]."  *Id.*

In short, Medina has no evidence to establish that her termination was

based on illegal gender discrimination.  Perhaps it was not necessary to terminate

her for the October 21, 2010 incident.  And perhaps Medina believes Zippy's did

not recognize her good work habits, focusing instead on isolated incidents of

workplace altercations.  *See* Doc. No. 30-1, Pl.'s Decl. ¶¶ 31-33.  But the question

before the court is not whether Zippy's *should* have discharged Medina.  *See*

*Simms v. Oklahoma ex rel Dep't of Mental Health & Substance Abuse Servs.*, 165

F.3d 1321, 1329 (10th Cir. 1999) (observing that it is not the role of federal courts

to "act as a super personnel department that second guesses employers' business

judgments").  Rather, the question here is whether Zippy's improperly discharged

her because of her gender, in violation of federal law.  In that regard, there is no

genuine issue of material fact -- under the applicable analysis, Medina's

termination did not violate Title VII's mandate against gender discrimination in

employment.

## B.     Count One:  Title VII Retaliation

Medina appears to contend that she was retaliated against for making

certain complaints.  Doc. No. 29, Pl.'s Opp'n at 13, 17; Doc. No. 25-12, Rand

Decl. Ex. K   As noted above, it is unclear whether she is basing this allegation on Title VII, the ADEA, or solely under state law.  What is clear here, however, is that Zippy's is entitled to summary judgment to the extent Plaintiff is attempting to claim retaliation under Title VII.

Under Title VII, an employer may not discriminate against an employee because the employee has opposed an employment practice made unlawful by Title VII.  *See* 42 U.S.C. § 2000e-3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice [prohibited by Title VII] . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."); *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006) ("Title VII's anti-retaliation provision forbids employer actions that discriminate against an employee . . . because he has opposed a practice that Title VII forbids or has made a charge, testified, assisted, or participated in a Title VII investigation, proceeding, or hearing." (citations and quotation signals omitted)).

But there is absolutely no evidence that Medina ever reported, made a charge, or opposed any incident of gender discrimination.  At most, she reported incidents of age-related remarks to management in 2009 (analyzed below), but

Medina made no similar reports of inappropriate remarks about gender.  There is thus no basis for a claim that Medina's termination could have been based on retaliation for opposing gender discrimination.[11]

Medina also appears to contend that her termination was related to (or in retaliation for) her filing a TRO against Nakila in February 2010.  But, although such an allegation might be relevant towards a state-law HWPA claim -- an assertion that the court ultimately does not reach -- it cannot be a basis for a Title VII-based retaliation claim.  Section 2000e-3(a) protects against retaliation for opposing "an employment practice made unlawful" *by Title VII* -- not for opposing employment practices made unlawful under state law.  Even if Zippy's terminated Medina because she opposed or reported a violation of state law in February 2010, when she filed the TRO against Nakila, such opposition would not be opposition to a Title VII violation.  It thus could not trigger § 2000e-3(a).  Accordingly, there is no basis for a Title VII retaliation claim.

## C.     Count Two:  Age Discrimination in Employment

Initially, Zippy's contends correctly that the alleged remarks made by co-worker Rudy ("old, fat, and jiggly") and by Nakila ("too bad there wasn't a pill

---

[11]   Even if there were, Medina would also need to establish "a causal link between her involvement in the protected activity and the adverse personnel action undertaken by the defendant[]."  *Freitag v. Ayers*, 468 F.3d 528, 541 (9th Cir. 2006).  She has no evidence to establish this element.

for being old," and "you know how it is when you get old, yeah?  Certain things

happen."), by themselves, are time-barred.  "Title VII and the ADEA both require

that an aggrieved party file a charge with the EEOC within 300 days of the

allegedly unlawful practice to preserve a claim for a subsequent civil suit."

*Kagawa v. First Hawaiian Bank/Bancwest Corp.*, 819 F. Supp. 2d 1125, 1130 (D.

Haw. 2011) (citing 42 U.S.C. § 2000e-5(e)(1) (Title VII), and 29 U.S.C. § 626(d)

(ADEA)).[12]  It is undisputed that those three remarks occurred before February

2010.  Similarly, any evidence that Nakila made similar comments to other staff at

Zippy's (Doc. No. 30-1, Pl.'s Decl. ¶¶ 46-47) concerns events in 2009.  Medina

filed her administrative charge on April 28, 2011, thus barring any discriminatory

---

[12]  In any event, these remarks, which were not made by anyone in Zippy's management, are nothing more than "stray remarks," insufficient by themselves to demonstrate age discrimination by Zippy's.  *See, e.g.*, *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 919 (9th Cir. 1996) (granting summary judgment to employer who talked about "old timers" because it was ambiguous and not tied to termination); *Merrick v. Farmers Ins. Grp.*, 892 F.2d 1434, 1438-39 (9th Cir. 1990) (holding that an employer's statement that it hired "a bright, intelligent, knowledgeable young man" was a stray remark that did not preclude summary judgment for employer).  And to the extent Medina contends such comments created a "hostile environment" for older workers, viewed in context, the comments were not "severe or pervasive" so as to alter the conditions of the workplace.  *See, e.g.*, *Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000) ("In order to prevail on her hostile work environment claim, [a plaintiff] must show that her workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her employment") (brackets, ellipses, and quotation marks omitted); *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("[O]ffhand comments . . . and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.") (internal quotation marks and citation omitted).

events that occurred before July 2, 2010.[13]   These age-based comments were made well before that date.

### 1.   Medina's Termination Was Not an Act of Age Discrimination

The remaining question, then, is whether Medina's termination on November 2, 2010 could have been an illegal act of age discrimination.  Again, the *McDonnell Douglas* framework applies, just as it does for Medina's Title VII claim.  *See Shelley v. Green*, 666 F.3d 599, 607-08 (9th Cir. 2012) (noting that the *McDonnell Douglas* burden-shifting framework applies to ADEA claims evaluated in the context of a summary judgment motion).  The court thus examines whether Medina has made a prima facie showing of age discrimination, and if so, whether Zippy's has proffered a legitimate, non-discriminatory reason for termination. Medina must then demonstrate a triable issue of fact as to whether that reason was pretext for age discrimination.  *Id.* at 608.

To establish a prima facie showing under the ADEA, a plaintiff must demonstrate that: (1) she was at least forty years old; (2) she was performing her job satisfactorily; (3) she experienced an adverse employment action; and (4) she

---

[13]   "[F]iling a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling."  *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982) (footnote omitted).  Nevertheless, Medina has no evidence that waiver, estoppel, or equitable tolling should apply in this case.

was either "replaced by substantially younger employees with equal or inferior qualifications or discharged under circumstances otherwise 'giving rise to an inference of age discrimination.'" *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008) (quoting *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1281 (9th Cir. 2000)).

Medina was over forty years old and was terminated. She fails, however, to make a prima facie case of age discrimination largely for the same reasons that she fails to make such a case for gender discrimination. As analyzed above, Medina has not established that she was performing "satisfactorily." Zippy's has demonstrated that, from its perspective, Medina had been involved in prior incidents of verbal altercations with co-employees regarding assignment of tables, and points again to the October 21, 2010 board-erasing incident with Olivera as continued workplace misconduct. She had been warned that another incident could result in termination. Moreover, she has not identified any "substantially younger employee" who was similarly situated as her (*i.e.*, with equal or inferior qualifications) that replaced her, and she has no evidence "giving rise to an inference of age discrimination." *Id*.[14] It is also of some significance that

---

[14] Olivera was *older* than Medina, and was suspended for a week following the October 21, 2010 incident. Doc. No. 25-16, Goya Decl. ¶¶ 5-6. There is also no indication that Olivera had a prior incident of misconduct (such as Medina's January 2010 altercation with Nakila)

(continued...)

Goya, one of the primary decision-makers in Medina's termination, was over sixty years old. *See, e.g.*, *Fairchild v. Forma Scientific, Inc.*, 147 F.3d 567, 572 (7th Cir. 1998) ("[T]hat the decision maker is older than the terminated employee is certainly significant in evaluating the evidence of discrimination.").[15]

What's more, even if Medina could establish a prima facie case of age discrimination, Zippy's has a legitimate, non-discriminatory reason for her termination -- the October 21, 2010 incident with Olivera. As analyzed above under Title VII, Medina has no evidence that this was a pretext for age discrimination. Medina has no evidence that Zippy's' "explanation is unworthy of credence," *Vasquez*, 349 F.3d at 641, and there is no dispute that Zippy's legitimately considered the incident to be inappropriate. *See Villiarimo*, 281 F.3d at 1063 ("In judging whether [defendant's] proffered justifications were false, it is not important whether they were objectively false (e.g., whether [plaintiff] actually lied). Rather, courts only require that an employer honestly believed its reason for its actions, even if its reason is foolish or trivial or even baseless.") (citation and

---

[14](...continued)
where Olivera received a warning about possible termination.

[15] Goya agreed with the recommendation of restaurant manager Kane that Medina's employment should be terminated. Doc. No. 25-16, Goya Decl. ¶ 4. The record does not reflect Kane's age, but Plaintiff does not assert -- and the record contains no evidence -- that *Kane* was biased against her because of her age.

internal quotation marks omitted).

2. ***Medina's Termination Could Not Constitute Retaliation under the ADEA***

Next, although not clear, Medina may be asserting that her termination

constitutes illegal retaliation under the ADEA's anti-retaliation provision, 29

U.S.C. § 623(d), which provides:

> It shall be unlawful for an employer to discriminate against any of his employees . . . because such individual . . . has opposed any practice made unlawful by this section, or because such individual . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter.

As with Title VII, the *McDonnell Douglas* burden-shifting framework

also governs actions for retaliation the ADEA. *Surrell*, 518 F.3d at 1105. In this

context, if the employee establishes a prima face case of retaliation, the burden of

production shifts to the employer to articulate a legitimate, nondiscriminatory

reason for its allegedly retaliatory conduct. *Metoyer*, 504 F.3d at 931 n.6. The

employee must then provide evidence that creates a genuine issue of material fact

concerning whether the employer's proffered nondiscriminatory reason is merely

pretext for age discrimination. *Coleman*, 232 F.3d at 1282. As with a Title VII-

based retaliation claim, to establish a claim of retaliation in violation of the ADEA,

a plaintiff must prove that (1) the plaintiff engaged in a protected activity, (2) the

plaintiff suffered an adverse employment action, and (3) there was a causal link

between the plaintiff's protected activity and the adverse employment action.

*Poland*, 494 F.3d at 1179-80.

      Here, construing the evidence in the light most favorable to Medina,

the only activity that could constitute "protected activity" under the ADEA was a

report Medina made to a manager that Nakila had made inappropriate comments

regarding her age.  *See* Doc. No. 30-1, Pl.'s Decl. ¶ 49.  Any such report, however,

was made *before* February 2010 -- at least eight months prior to Medina's

termination in November 2010.  The passage of time between the protected activity

and the adverse action, in the absence of any other evidence, strongly suggests a

lack of retaliatory motive.  *See, e.g.*, *Villiarimo*, 281 F.3d at 1065 ("A nearly 18-

month lapse between protected activity and an adverse employment action is

simply too long."); *Vasquez*, 349 F.3d at 646 (finding no causal link where the

protected activity occurred thirteen months prior to the alleged adverse action and

where plaintiff provided no evidence of surrounding circumstances showing a

retaliatory motive); *see also Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-

74 (2001) (reasoning that an "[adverse] action taken . . . 20 months later [than that

protected activity] suggests, by itself, no causality at all" and citing case law where

a three- and four-month period between the protected activity and adverse action

was not close enough, without more, to establish causation).

Moreover, even if Medina could establish some question as to a causal link between her prior report of age-related remarks by co-employees in 2009 and her termination in November 2010, Zippy's certainly has a legitimate, non-discriminatory reason for her termination -- the October 21, 2010 incident with Olivera.  And, again, Medina has *no* evidence of pretext.  In short, for the same reasons that the gender and age-based claims fail, Zippy's is also entitled to summary judgment on Medina's claim of retaliation (to the extent it is grounded in the ADEA).

**D.    The Court Declines to Exercise Supplemental Jurisdiction over the HWPA Claim**

Zippy's has obtained summary judgment in its favor on all of Medina's federal claims.  The only claim remaining is Count Three for alleged violations of the HWPA, a state law claim over which the court has only supplemental jurisdiction.[16]  (There is no basis in the Complaint for jurisdiction

---

[16]  The HWPA provides:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because:
> (1)  The employee, or a person acting on behalf of the employee, reports or is about to report to the employer, or reports or is about to report to a public body, verbally or in writing, a violation or a

(continued...)

33

based on diversity of citizenship, as Medina is a resident and citizen of Hawaii, and Zippy's is a Hawaii company.)

Under 28 U.S.C. § 1367(c)(3), "district courts may decline to exercise supplemental jurisdiction . . . if . . . the district court has dismissed all claims over which it has original jurisdiction[.]" "[W]hen deciding whether to exercise supplemental jurisdiction, 'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'" *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)); *Acri v. Varian Assocs.*, 114 F.3d 999, 1001 (9th Cir. 1997) (en banc).

Because state courts have the primary responsibility for developing and applying state law, "the values of judicial economy, convenience, fairness and comity" do not favor retaining jurisdiction in this case. *See Acri*, 114 F.3d at 1001 (providing that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors will point towards declining to exercise

---

[16](...continued)
suspected violation of:
    (A) A law, rule, ordinance, or regulation, adopted
    pursuant to law of this State, a political subdivision
    of this State, or the United States. . . .

HRS § 378-62.

34

jurisdiction over the remaining state-law claims" (quoting *Carnegie-Mellon Univ.*, 484 U.S. at 350 n.7)).

Therefore, the court declines to continue exercising supplemental jurisdiction over the HWPA claim.  The court does not address questions such as whether filing a TRO against Nakila under state law constitutes a "report to a public body" of "a suspected violation of" state law, or whether Medina was discriminated against because of the TRO.  This action was originally filed in state court, and was removed by Zippy's based on the existence of the federal claims, which have all been dismissed.  Accordingly, the action -- which now contains only Count Three for an alleged violation of the HWPA -- is REMANDED to the First Circuit Court of the State of Hawaii.

///

///

///

///

///

///

///

///

# V.  <u>CONCLUSION</u>

The court GRANTS Defendant FCH Enterprises, Inc., dba Zippys'

Restaurants' Motion for Summary Judgment, Doc. No. 24, on all claims except

Count Three under the HWPA.  The remainder of the action is REMANDED to the

First Circuit Court of the State of Hawaii.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii:  June 19, 2013.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Medina v. FCH Enters. Inc., dba Zippy's Rests.*, Civ. No. 12-00364 JMS-KSC, Order  Granting
in Part Defendant FCH Enterprises, Inc., dba Zippy's Restaurants' Motion for Summary
Judgment, and Remanding Remaining Action to the First Circuit Court of the State of Hawaii